UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

ANDREA J. VERHEIN,

        Plaintiff,

        v.                                  Case No. 03-C-1424

JO ANNE BARNHART, Commissioner,
Social Security Administration,

        Defendant.

---

**DECISION AND ORDER REVERSING AND REMANDING
THE COMMISSIONER'S DECISION**

---

On July 13, 2001, the plaintiff applied for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 402(e), 405(g) (Act). (R. at 14.) In her DIB application, the plaintiff alleged that her disability began on September 1, 1999. However, during the April 8, 2003, hearing before an Administrative Law Judge (ALJ), the plaintiff, through counsel, amended the onset date to May 1, 2000, because she "think[s]" she engaged in significant work.[1] After hearing testimony from the plaintiff as well as a vocational expert, the ALJ issued a decision on August 28, 2003, denying the plaintiff's DIB application. (*Id.* at 62-71, 14-24.) The plaintiff exhausted the administrative review options and that process produced the same results. Consequently, the ALJ's decision became the defendant's final decision on March 29, 2004. (*Id.* 6-8.) As a result, the plaintiff seeks judicial review of the decision denying her application for DIB benefits. (Pl.'s Br. at 1; Def.'s Br. at 2; *See id.* at 6-8.)

---

[1] The Social Security Administration concluded that the plaintiff's work after the September 1, 1999, onset date was not substantial, gainful activity. (R. 36, 110-13.)

## I. Relevant Information

### A. The Plaintiff's Biographical Information and Previous Work Experience

The plaintiff, who was forty-four at the time of the April 8, 2003, hearing, testified that she completed the twelfth grade, is able to read and write and that with the exception of family and friends, she had no other income sources. (R. at 38.) But, between December of 2000 and early April of 2001, the plaintiff explained that she worked for Smart Staff, a temporary service, that placed her at three different sites: (1) a factory, (2) an assembly factory and (3) a packing plant. (*Id.*) However, the plaintiff offered that her health problems caused her to stop working and that since early April of 2001, she has not engaged in any kind of work. (*Id.*) Further, the plaintiff stated that her prior employment experience included working at Burn's Security in October and November of 2000, where she sat to perform most of her duties. (*Id.* at 39.) But again for health reasons, the plaintiff advised that she had to leave. (*Id.*) From November of 1999 to May of 2000, the plaintiff noted that she worked for Argus Technical Services, another temporary agency, that placed her at ABB Automation, an assembly factory where she performed her duties sitting and standing. (*Id.*) Before employment by ABB, the plaintiff submitted that she worked at Erie Controls from December of 1997 to September of 1999. (*Id.*) Erie Controls, the plaintiff commented, employed her to assemble control valves, while standing and sitting, and required her to lift and carry between forty and fifty pounds. (*Id.* at 40.) Lastly, for sixteen years, the plaintiff worked at KCS Industries assembling bar and neon signs, while mostly standing, and was required to lift and carry between forty and fifty pounds. (*Id.*) During the last two or three years of her employment at KCS Industries, the plaintiff advised that her health problems affected her ability to work. (*Id.*)

2

### B. The Plaintiff's Disability Claim

The plaintiff testified that she is five feet four inches, weighs about 180 pounds, has tendinitis in her right hand, arthritis in her back, a herniated disk in her lower back, a fatty tumor on the end of her spinal cord and suffers depression. (*Id.* at 41, 47, 50.) Additionally, the plaintiff explained that she has headaches and experiences pain in her neck, ribs, chest area, hands, lower back and left foot. (*Id.* at 41.) Also, the plaintiff offered that she feels the most pain in her right hand and lower back and that the pain in her lower back was constant. (*Id.*) On a scale of one to ten, with the number one representing a minor bruise and the number ten equivalent to pain that would cause her to scream while traveling to the hospital, the plaintiff assessed her average low back pain as eight. (*Id.* at 42.)

Although the plaintiff had pain in both hands, she clarified that the pain in her right hand was constant and worse than the periodic pain in her left hand. (*Id.* at 42-43.) The plaintiff advised that she is right-handed and experienced pain in the middle of her forearm down to all her fingertips in the right hand. (*Id.* at 42.) With respect to the area below the wrist and fingertips, the plaintiff offered that they were painful, ached and occasionally sore. (*Id.* at 42.) Using the same scale described above, the plaintiff claimed that the average pain in her left hand was a five and in her right hand was "about eight." (*Id.* at 43.) According to the plaintiff, throbbing headache pain in her forehead was triggered by pain from her hand and back thereby requiring her to lie in a dark quiet room for a couple of hours to prevent the light from nauseating her. (*Id.* at 43-45.)

To treat her headache, the plaintiff submitted that she took Fioricet about four times a month, Trazodone to sleep approximately four hours each night, Zoloft for

3

depression, Nexium for heartburn and Vioxx, which relieved the pain "a little bit[.]" (*Id.* at 45-46, 48-49, 52, 153.) Additionally, the plaintiff reported that she took really hot showers, used heating pads, laid down and rested daily between two to three hours and, about two to three days a week when the pain flared up, she laid down and rested between five and six hours. (*Id.*) The plaintiff's non prescription medication consisted of Extra Strength Tylenol for pain and headaches, Women's Tylenol Menstrual Relief to treat cramps and Pepcid Complete for her heartburn. (*Id.* at 153.) Damp weather, cold weather, nighttime, certain movements, as well as the onset of menstrual cycles, worsened the plaintiff's pain. (*Id.* at 46-47.)

According to the plaintiff, Dr. Jeffrey Smith, her primary care physician for approximately a year, and Dr. Daniel Rossler, a rheumatologist, diagnosed her as having fibromyalgia. (*Id.* at 47.) Besides prescribing pain medication, in the plaintiff's viewed, the doctors were doing "nothing[.]" (*Id.*) Despite this criticism, the plaintiff offered that she had been to physical therapy and tried splints and cortisone injections which caused her to become dizzy and drowsy. (*Id.* at 48.) The plaintiff characterized her day time energy as "low" and mentioned that she saw Dr. Lamberton, a psychiatrist, and Kim Kwalaman, a therapist. (*Id.* at 49.) According to the plaintiff, Dr. Lamberton's notes advised that she had "major depression recurrent severe." (*Id.* at 49.)

The plaintiff added that because of the depression, she had low self-esteem, spent a lot of time alone in her bedroom, has had suicidal thoughts and had crying spells about two to three times each week. (*Id.* at 50.) Furthermore, in the past year or two, the plaintiff offered that her weight increased from approximately 140 and 150 pounds to 180 pounds. (*Id.*) The plaintiff reported that she was no longer able to engage in activities she

4

enjoyed, like sports, stained glass, stitching and resigned herself to watching television and reading, even though her level of concentration was "not good." (*Id.* at 51-52.)

Most of the plaintiff's household duties, namely grocery shopping, cleaning and laundry, the plaintiff submitted, were performed by her younger sister. (*Id.* at 54.) The plaintiff stated that because of her health, she drove infrequently, socialized very little and did not have any friends. (*Id.* at 55.) She noted that some days, the pain prevented her from petting her dog, filling out forms, sitting in a chair for more than thirty minutes without getting up, walking and standing for longer than fifteen to twenty minutes or walking for more than two blocks. (*Id.* at 55-56.) According to the plaintiff, she was able to dress and groom without assistance, but her grooming habits had changed due to the pain. (*Id.* at 55.) Moreover, the plaintiff claimed that she needed assistance preparing meals and relied on microwave meals. (*Id.*)

In response to the ALJ's questions, the plaintiff explained that it is "too early to say" if the services she received from Dr. Lambert and Ms. Kwalaman will help, that her mood affected how much she hurts and whether she experienced any pain, her hand would hurt when she lifted it above her head and she had difficulty typing and writing, and therefore was unable to use a keyboard. (*Id.* at 59-62.) Lastly, plaintiff noted that she used her left hand to hold stuff and that "sometimes" her neck troubled her making it difficult to look over her shoulders to change lanes while driving, particularly from her left side, her blind spot. (*Id.* at 60-61.)

## II. ALJ's Findings

In his decision dated August 28, 2003, the ALJ made the following eight findings. (*Id.* at 23-24.)

1. The claimant meets the non disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. Claimant alleges she has not engaged in substantial gainful activity in since September 1999, later amending that date May of 2000, however, the undersigned finds a [sic] claimant had been a engaged in substantial gainful activity up to April 2001.

3. The medical evidence establishes a [sic] claimant has complaints of back pain and general musculoskeletal complaints, possibly consistent with fibromyalgia, aggravated by obesity, right hand complaints, possibly consistent with tendinitis, a mild non-severe affective disorder, primarily related to situational variables and complaints of headache, partially related to her menstrual period, but she does not have an impairment or combination of impairments which meet or equal any of those listed in appendix 1, subpart P., regulations No. 4.

4. While claimant has [sic] have some degree of pain, it is not as severe or limiting as claimant has alleged with clear elements of exaggeration present.

5. Claimant has the residual functional capacity to perform at least light work provided that there is no continuous repetitive use of the hands. She has the mental capacity for at least unskilled to low-level semiskilled tasks. She may be precluded from more skilled types of tasks which required extensive concentration.

6. Claimant's past relevant work as an assembler and factory laborer is not precluded by the above limitations.

7. Claimant's impairments do not prevent her from performing her past relevant work.

8. Claimant was not under disability as defined in the Social Security Act at any time to the date of this decision.

### III. Summation of the Parties' Arguments

#### A. The Plaintiff

The plaintiff first argues that the ALJ assessed her mental impairment improperly. (Pl.'s Br. at 4-9.) She contends that the ALJ did not follow the correct legal standards, relied upon insubstantial evidence and rendered faulty residual capacity findings. These errors, the plaintiff advises, prevented the ALJ from evaluating the Listings as well as the equivalence to the listings properly, thereby causing the ALJ to falter at steps four and five of the sequential evaluation process. (*Id.* at 4.)

According to the plaintiff, the regulations delineate a "special technique" for the ALJ to use in evaluating her medical impairment at step two. (*Id.* at 5.) This step, the plaintiff highlights, requires the ALJ to make a determination based on medical evidence. (*Id.* at 7.) However, the plaintiff contends that the ALJ erred in relying on Exhibit 8F, a report he believed was prepared by Wisconsin Disability Determination Bureau's Medical Staff. (*Id.*) However, the plaintiff submits that the exhibit was prepared by a State disability examiner and it did not contain the signature of a medical consultant. (*Id.*) Because "[a] layperson is not qualified to provide a medical opinion[,]" the plaintiff asserts that the ALJ should have disregarded the disability examiner's finding that the plaintiff "did not have a severe impairment . . . and that she could do light work provided there was only limited handling." (*Id.*)

Nevertheless, even if "an agency doctor rubber stamped the form[,]" the plaintiff claims that "it would not support a finding of non-severe impairment" because "[t]he Seventh Circuit has made clear [that] an 'ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory

7

opinion of a non-examining physician does not, by itself, suffice." (*Id.*)  Furthermore, the plaintiff comments that the ALJ failed to acknowledge the examining and treating psychiatrist reports advising that the plaintiff had a severe mental impairment and disregarded medical evidence in the record finding that the plaintiff has a severe mental impairment.  (*Id.* at 7-8.)

Additionally, the plaintiff notes that the ALJ is not a doctor, cannot offer his lay opinion, make unfounded speculations that Dr. Rosler lacks the qualification to evaluate depression without providing any support, then elects to embrace Dr. Smith's opinion without evidence that Dr. Smith has the qualifications to evaluate depression.  (*Id.* at 9-10.)  Consequently, the plaintiff concludes that the ALJ erred at step two concerning her mental impairment, causing a negative impact on the sequential evaluation at steps three, four and five.  (*Id.* at 10.)  Specifically, the plaintiff asserts that at step three the ALJ did not evaluate the Listings properly and failed to reference a mental listing.  (*Id.*)  Hence, the plaintiff asks this court to find that the ALJ's decision is not supported by substantial evidence.  (*Id.*)

Next, the plaintiff offers that the ALJ failed to give the statements rendered by a treating source great weight as required by the regulation, or as the Seventh Circuit directs in *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000), provide "good reasons" for discounting those medical opinions.  (*Id.* at 15.)  Furthermore, the plaintiff submits that the Seventh Circuit instructs ALJs not to describe the claimant's past work in a generic way.  (*Id.* at 16.)  She adds that the ALJ must list the specific physical requirements of the claimant's previous jobs and assess the individual's ability to perform those tasks in light of the evidence presented.  (*Id.*)  Notwithstanding this directive, the plaintiff contends that

8

the ALJ did not specify the job he believed the plaintiff could return to and failed to delineate a list of duties involved in the plaintiff's previous employment. (*Id.*)

Lastly, the plaintiff argues that the ALJ did not evaluate her credibility respecting her symptoms as required. (*Id.* at 16-23.) With regards to this conclusion, the plaintiff asserts that the ALJ did not comply with the SSR 96-7p and erroneously relied on the Career Ability Placement Survey (CAPS) test to make a credibility determination that was not warranted or supported by substantial evidence. (*Id.* at 21-23.)

### B. The Defendant's Response

The defendant begins by asserting that the ALJ did not commit an error at step two that would require the court to remand this case. (Def.'s Br. at 11-12.) In support of this position, the defendant contends that even if the court concludes that the ALJ made an error in not finding that the plaintiff's depression was a severe impairment, the ALJ complied with the regulations that allow him to bypass step two and consider all of the plaintiff's severe and non-severe impairments at the remaining steps of the sequential evaluation. (*Id.*) Notwithstanding the ALJ's assessment that the plaintiff's depression was non-severe, he still included a mental limitation in his RFC analysis. (*Id.* at 12.) Because the plaintiff does not challenge the ALJ's RFC finding, does not argue that she had additional mental limitations, does not point to anything in the record showing that a mental health professional found she had greater limitations than those imposed by the ALJ, the defendant claims that the ALJ's finding concerning the plaintiff's mental impairment had no effect on the remaining steps of the sequential evaluation. (*Id.*)

The defendant submits that the ALJ proceeded properly in considering the objective medical evidence and the physicians opinions with respect to the plaintiff's RFC.

(*Id.* at 12-18.) Because the plaintiff listed other ailments besides Fibromyalgia, the defendant concludes that it was reasonable for the ALJ r to consider the medical evidence that related to the plaintiff's other significant impairments, particularly the plaintiff's claim of a disabled hand and wrist pain. (*Id.* at 13.) Although the ALJ did not dispute the plaintiff's diagnosis of Fibromyalgia Syndrome by one treating physician *per se*, the defendant proffers that there is no evidence in the record to support the diagnose. (*Id.* at 15.) Consequently, the defendant concludes that the ALJ's RFC finding was supported by substantial evidence and that the ALJ provided ample reason for rejecting a treating physician's opinion. (*Id.*)

According to the defendant, the plaintiff's ability to engage in substantial gainful activity, a year beyond her amended disability onset date, coupled with the fact that the alleged disabling conditions existed before she stopped working full time, undermined the credibility of her subjective complaints. (*Id.* at 18.) Lastly, the defendant contends that "it is quite clear from the ALJ's questioning of the VE that the only job fitting into the parameters of the ALJ's RFC finding was the Argus Automation assembly job, which [the] [p]laintiff performed at the light exertional level." (*Id.* at 19.)

## IV. Standard of Review

To obtain disability benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration (Administration) has

adopted a sequential five-step test for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4).

>Under this test, the ALJ must determine:
>
>(1) Whether the claimant is currently engaged in substantial gainful activity ("SGA");
>
>(2) If not, whether the claimant has a severe impairment;
>
>(3) If so, whether the claimant's impairment(s) meets or equals one of the impairments listed in the Administration's regulations as being so severe as to preclude SGA;
>
>(4) If not, whether the claimant can perform her past relevant work;
>
>(5) If not, whether the claimant can make the adjustment to other work.

*Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant makes the necessary showing at steps one through three, he will be found disabled. If the impairment is not of such severity as to be presumptively disabling, the ALJ must consider whether the claimant possesses the residual functional capacity (RFC) to perform past work. If not, the burden shifts to the Secretary to demonstrate that the claimant can be successful performing a significant number of other jobs in the national economy. *Young*, 362 F.3d at 1000.

Under § 405(g), the district court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Id.* Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). If the ALJ commits

11

an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ commits such an error if he fails to comply with the Commissioner's Regulations and Rulings. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

## VII. Discussion

From the outset, it is worth noting that the limitation the defendant placed on the court's standard of review is incorrect. Indeed, the court must determine whether substantial evidence exists in the record to support an ALJ's decision. But in this review process, should the court conclude that the ALJ committed a legal error by failing to comply with the Administration's Regulations and/or Rulings, this court must reverse the ALJ's decision regardless of the volume of evidence supporting the decision. Such is the scenario presented here.

Because "[t]he onset date of disability is the first day an individual is disabled as defined in the Act and the regulations[,]" and generally governs the date the DIB benefits begin, the onset date must be established. SSR 83-20. The Administration, in SSR 83-20, states its policy and the relevant evidence the ALJ must consider in establishing the claimant's disability onset date. These factors, which are evaluated together to arrive at the onset date, include the individual's allegations, the individual's work history, the medical evidence and other evidence concerning the claimant's impairment severity. SSR 83-20. Here, the record reveals that the onset date of the plaintiff's disability is unclear.

Originally, the plaintiff claimed that her disability began on September 1, 1999. (*Id.* at 36.) However, during her hearing before the ALJ, she amended the onset

12

date to May 1, 2000, even though the Administration's Field Office Disability Report indicated that the work she performed after September 1999, was not substantial gainful activity. (*Id.* at 36, 110-13.) In any event, the ALJ found that the work the plaintiff performed at Burns Security and Smart Staff between the latter part of 2000 and early 2001 constituted substantial gainful activity and concluded that the plaintiff was engaged in substantial gainful activity until April 2001. (*Id.* at 16, 21, 24.) Considering this finding, it is unclear whether the ALJ established the plaintiff's disability onset date as of April 2001. Further, the date the plaintiff ceased to engage in substantial gainful activity is unclear.

The Seventh Circuit has explained that if the claimant is "substantially gainfully employed, that is the end of" the individual's claim, despite the claimant's ability to offer "compelling medical evidence" to sustain the disability allegation. *Jones v. Shalala*, 21 F.3d 191, 192-93 (7th Cir. 1994). The plaintiff admits that she stopped working in early April of 2001, because of her health problems. (R. at 38.) But she argues that the work at Burns Security, between October and November 2000, and her tenure at Smart Staff from December 2000 and early April 2001, was not substantial gainful activity. (*See id.* at 10.)

While the relationship between the plaintiff's disability onset date and the date she stopped engaging in substantial activity is unclear, in light of *Jones*, if the plaintiff's disability onset date was May 2000 and the plaintiff remained employed in substantial gainful work activity, that was the end of her claim. *Jones*, 21 F.3d at 192-93. Such a conclusion, however, hinges on a determination of whether the work at Burns Security and Smart Staff constituted substantial gainful activity.

13

According to the regulations, "substantial gainful activity is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. Specifically,

> (a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
>
> (b) Gainful work activity. Gain work activity is work activity that you do for pay or profit. Work activity is gainful it is the kind of work usually done for pay or profit, whether or not a profit is realized.

§ 404.1572. Although "[e]arnings of more than $700] per month create a rebuttable presumption of substantial gainful activity[,]" § 416.974, the Seventh Circuit explained that "if the claimant had a kindly employer or kindly fellow employees, or had reached the bare threshold . . . by dint of exertions that he could not sustain on a full-time basis, these circumstances could rebut the presumption of substantial gainful activity." *Jones v. Shalala*, 21 F.3d at 192-93 (7th Cir. 1994); *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) (work does not constitute substantial gainful activity if other employees were responsible for half of the claimant's productivity and involved "constant on-site supervision.")

Here, the ALJ simply says that "this work [i.e., the plaintiff's work at Burns Security and Smart Staff] too would constitute substantial gainful activity." (R. at 16.) The legal analysis and supporting facts he used to reached this decision are unknown to this court. Consequently, on remand the ALJ must provide insight as to how he reached the decision that the plaintiff's work after May 2000 constituted substantial gainful activity, particularly because the Administration found the work during that time not to be substantial gainful activity.

14

In SSR 85-28, the Administration explains that at the second step of the sequential evaluation,"medical evidence alone is evaluated in order to assess the effects of the impairment(s) on [the claimant's] ability to do basic work activities." SSR 85-28. When the claimant asserts a mental impairment, the regulations provide a special technique for the ALJ to use in evaluating the claim. 20 C.F.R. § 404.1520a(a). The Code of Federal Regulations require the ALJ to record the application of the technique to the claimant's facts, and to articulate in the decision a specific finding as to the claimant's limitations in each of the functional areas.[2] § 404.1520a(e)(2).

Here, the ALJ's decision does not demonstrate that he applied the special technique to the plaintiff's claim of mental impairment. Moreover, the ALJ did not include in his decision the plaintiff's degree of limitation, if any, in each of the functional areas. Additionally, there was failure to use only medical evidence in determining whether the plaintiff's impairment was severe. The Psychiatric Review Technique, Exhibit 8F, that the ALJ used to support his finding of a non-severe impairment, is not a permissible source because a disability examiner, a lay person completed the form. (R. at 263-76.) The Code of Federal Regulations advise that a layperson is not qualified to render a medical opinion and thus the form does not qualify as medical evidence. § 404.1513(a).

The notes of Dr. Lamberton, the plaintiff's examining and treating psychiatrist, offer his assessment with respect to her purported mental impairment. (R. at 310-14.) Yet the ALJ's decision does not reference Dr. Lamberton's observations respecting the plaintiff's ability to function. As the Seventh Circuit explained, an "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the

---

[2]The four functional areas include (1) activities of daily living, (2) social functioning, (3) concentration, persistence or pace, and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

15

record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

The Code of Federal Regulations state that opinions from treating sources are generally given great weight, because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)". *See* 20 C.F.R. § 404.1527(d)(2). Consequently, the Administration states that "[w]e will always give good reasons . . . for the weight we give your treating source's opinion." *Id.* Consistent with this policy is SSR 96-2p's detail discussion about how the ALJ should give controlling weight to medical opinions rendered by treating sources.

The plaintiff's treating physicians, Dr. Jeffrey Smith, Dr. Janna Oganessian and Dr. Rosler, offered medical opinions which the ALJ rejected. While the Code of Federal Regulations permit him to do so, the ALJ must be clear in stating the source of the medical opinions he used to reach his decision and explain his reasons for rejecting the medical opinions rendered by the plaintiff's treating physicians.

The vocational expert, Beth A. Hoynik, testified at the plaintiff's hearing. (R. at 62-71.) As a consequence, the ALJ used that testimony to analyze the plaintiff's work history and to conclude that "claimant's past relevant work as an assembler and factory laborer is not precluded by the above limitations." (*Id.* at 24 ¶ 6.) Although it is unclear to which job the ALJ thought the plaintiff could return, in reaching this decision, the ALJ again failed to comply with the Code of Federal Regulations.

In *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984), the Seventh Circuit explained "to determine whether she[, the claimant,] is physically capable of returning to

16

her former work, the administrative law judge obviously must ascertain the demands of that work in relation to the claimant's present physical capacities, see 20 C.F.R. § 404.1520(e)." Later, in *Nolen v. Sullivan*, 939 F.2d 516 (7th Cir. 1991), the Seventh Circuit quoted *Strittmatter* to advise that "[w]e reiterate that the ALJ must specify the duties involved in a prior job and assess the claimant's ability to perform the specific tasks." *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991). Here, the ALJ does not specify the demands of the plaintiff's previous positions and does not assess her ability to return and perform one of her past jobs.

Now, therefore,

IT IS ORDERED that the ALJ's decision is reversed and the court remands this matter for further proceedings consistent with this decision.

Dated at Milwaukee, Wisconsin, this 18th day of August, 2005.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge